**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BETTY LAMB,** | : | |
| Plaintiff | : | **CIVIL ACTION NO. 3:05-2491** |
| v. | : | **(CONABOY, D.J.)** |
| | : | **(MANNION, M.J.)** |
| **JO ANNE B. BARNHART,** Commissioner of Social Security, | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. § 405(g) to determine whether there is substantial evidence to support the Commissioner's decision to deny the plaintiff's claim for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 401-433.

**I. Procedural Background**

The plaintiff protectively filed an application for DIB on January 6, 2003, alleging disability since May 28, 2002 due to fibromyalgia, osteoarthritis, chronic fatigue syndrome, irritable bowel syndrome, and a bladder control problem. (TR. 68-71, 130). The plaintiff's claim was denied initially. (TR. 24, 36-39). The plaintiff then requested a hearing, and one was held before an administrative law judge ("ALJ") on February 10, 2004. (TR. 30, 312-66). The

plaintiff and a vocational expert ("VE") testified. (TR. 312-66). The ALJ issued a decision on March 18, 2004 denying the plaintiff's claims. (TR. 12-23).

The plaintiff filed a request for review of the ALJ's decision. (TR. 63). On May 13, 2005, the Appeals Council denied the request for review. (TR. 11). Thus, the ALJ's decision became the final decision of the Commissioner. 42 U.S.C. § 405(g). Currently pending is the plaintiff's appeal, filed on December 2, 2005, of the Commissioner's decision. (Doc. No. 1).

## II. Disability Determination Process

A five-step process is required to determine if a claimant is disabled under the Act. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents her from doing past relevant work, and; (5) whether the claimant's impairment prevents her from doing any other work. 20 C.F.R. § 404.1520.

The instant decision was ultimately decided at the fourth step of the process, when the ALJ concluded that, given the plaintiff's residual functional capacity ("RFC"), she was capable of performing her past relevant work as an accounting clerk. (TR. 22). 20 C.F.R. § 404.1520(4)(iv).

### III. The ALJ's decision

Using the above-outlined procedure, the ALJ determined that: (1) the plaintiff had not performed substantial gainful activity since May 28, 2002; (2) the plaintiff's fibromyalgia was "severe" under 20 C.F.R. § 404.1520(c), but; (3) did not meet or medically equaled any impairment listed in Appendix I, Subpart P, Regulations No. 4, and; (4) the plaintiff could perform a limited range of light work with a sit/stand option and could, therefore, perform her past relevant work as an accounting clerk. (TR. 22-23).

With respect to step four, the ALJ found that the plaintiff's past relevant work as an administrative assistant, secretary, and accounting clerk was classified as skilled and sedentary but was light as she performed it.  (TR. 21).  The ALJ noted that the VE testified that the plaintiff could perform all three past relevant occupations as they are generally performed in the economy, but determined that the plaintiff's fibromyalgia pain would limit her to performing only her past relevant work as an accounting clerk, which, the ALJ noted, was classified "at the low level of skilled work" in the Dictionary of Occupational Titles ("DOT").  (TR. 21-22).

### IV. Evidence of Record

The plaintiff was fifty-nine-years-old, and considered a "person of advanced age" under the Act, at the time of the ALJ's decision. (TR. 16). 20 C.F.R. § 404.1563(e).  She has past relevant work as a school secretary, an administrative assistant, and a technical assistant.  (TR. 131).

3

The plaintiff alleged that she stopped working on May 28, 2002 because she was very stressed; had poor concentration; had to make frequent trips to the bathroom; had to rely on fellow workers; and was let go due to budget cuts. (TR. 130). The plaintiff's former supervisor, Frances S. Ligler, D.Phil, D.Sc., sent the plaintiff's attorney an email, in which she stated that the "quality and quantity" of the plaintiff's work diminished after she developed fibromyalgia; that the plaintiff was always tired and frustrated; that she produced documents at about half her previous pace and made data entry mistakes she had never made before; that the plaintiff had tried working part-time but that did not solve the problem; and that it was not until the plaintiff stopped working that she was able to get her pain under control. (TR. 269). Dr. Ligler stated that before the plaintiff developed fibromyalgia, she had been well-respected as an administrator and handled her job duties well. *Id*.

Dr. Eric Schoen, a rheumatologist, has treated the plaintiff since November 2000. (TR. 224). In November 2000, the plaintiff complained of hip, thigh, knee, and ankle pain, as well as low energy and chronic fatigue. *Id*. She reported that her pain was worse with activity. *Id*. Dr. Schoen noted that the plaintiff had ten out of eighteen tender points and diagnosed fibromyalgia. Dr. Schoen prescribed Flexeril and encouraged the plaintiff to continue her regular exercise program, which consisted of three to four one-hour session per week at a gym. (TR. 220, 225).

In February 2001, the plaintiff reported that a local injection for bursitis had not helped her; that she was sleeping better with the Flexeril but had no

4

energy after 3 p.m.; that she still exercised regularly but was able to do less than her previous norm; and that she had episodes of intense pain in her left thigh and shin.  (TR. 217).  Dr. Schoen noted that the plaintiff's left leg pain could be "radicular for nerve entrapment," increased the plaintiff's dosage of Vioxx, and started the plaintiff on Prednisone.  *Id*.  The following month, the plaintiff complained of diffuse pain, most prominent in her left leg, and interrupted sleep.  (TR. 215).  Dr. Schoen reported that the plaintiff had fourteen out of eighteen tender points, decreased range of motion in her left hip, mild tenderness along the proximal hip adductors on the left, and a tender bilateral posterior iliac spine.  *Id*.  Dr. Schoen again increased the plaintiff's dosage of Vioxx, started her on Elavil, and discontinued Prednisone treatment.  *Id*.

    Dr. Schoen prescribed acupuncture in March 2001.  (TR. 214).  In April 2001, Jeanne Chiang, M.D., summarized the plaintiff's relevant medical history prior to beginning acupuncture.  (TR. 213).  Chiang noted that the plaintiff's left hip arthritis had started two years prior and had not improved with anti-inflammatory drugs, steroids, local injections, or physical therapy.  *Id*.  Dr. Schoen also reported that the plaintiff had insomnia in the past but slept regularly due to the combination of her pain medications.  *Id*.  After treatment began, the plaintiff reported that she had more energy and that her left hip did not hurt as much, although her left hip range of motion was unchanged.  The plaintiff also complained of right wrist deep pain, which she attributed to typing more than usual.  (TR. 211).  The plaintiff continued to

5

report improvement in her hip pain. (TR. 207-10). In June 2001, the plaintiff reported that she could walk a couple of miles every evening. (TR. 203).

In April 2002, the plaintiff complained of more pain in her forearms and radial wrists related to increased typing at work. (TR. 193). Dr. Schoen reported that the plaintiff was now working only four days a week to decrease stress. Dr. Schoen advised the plaintiff to ice her wrists at the end of the work day and to wear a thumb splint. *Id*.

Notably, since the plaintiff's alleged disability onset date of May 28, 2002, she has sought medical care less frequently than before. In September 2002, the plaintiff told Dr. Schoen that she had taken three months off from working over the summer and was exercising regularly, doing water aerobics and walking. (TR. 186). She reported that she felt better but had pain in her right foot and bilateral forearms. *Id*. She had positive Finkelstein's signs bilaterally and her right foot was diffusely tender with no swelling.

In February 2003, the plaintiff complained of urinary frequency to Carl Johnson, M.D. (TR. 183). The plaintiff reported that she could not sit through church functions, plays, or car trips, and had a poor quality of life. The plaintiff's urology work-up was negative. *Id*. The plaintiff reported no fatigue or sleep change and was alert, oriented, and in no acute distress. *Id*. The plaintiff was already taking Ditropan, and Dr. Johnson increased the dosage. *Id*.

In April 2003, the plaintiff reported to Dr. Schoen that she still had frequent bouts of severe pain in her legs and/or arms. (TR. 280). She

reported some relief with a new pain medication but noted that the pain was intense if she did not take it.  *Id*.  The plaintiff further reported that she was not sleeping at night.  *Id*.  On physical examination, the plaintiff had eighteen out of eighteen tender points, and normal range of motion in all joints except for a decrease in internal rotation of the left hip.  *Id*.  Her hands, elbows, and knees were tender but the plaintiff could make an intact claw and fist with her hand and had no swelling in her knees.  *Id*.

In May 2003, the plaintiff saw Dr. Johnson with a request for a disability evaluation.  (TR. 277-79).  She reported muscle pain and joint stiffness and said that she had difficulty going to work.  (TR. 278).  She denied fatigue, weight change, night sweats, appetite change, sleep change, or pulmonary, cardiovascular, or gastrointestinal problems.  *Id*.  She reported pain with a variety of movements and with certain palpations, but had normal muscle strength in all extremities, normal gait, and normal mood.  (TR. 278-79).  Dr. Johnson gave the plaintiff a letter stating that the plaintiff's fibromyalgia gave her difficulty walking, standing, and doing her activities of daily living, but noting that not all of her days were severe.  (TR. 276).

Dr. Schoen also completed a disability report on the plaintiff's behalf.  (TR. 263-67).  Dr. Schoen's report was a form consisting of fill-in-the-blanks and checked boxes.  *Id*.  Dr. Schoen opined that the plaintiff was incapable of even low stress jobs; could sit, stand, or walk only two hours in an eight-hour day; could walk only half a block before experiencing severe pain or needing rest; would need unscheduled breaks; and could never lift or carry

7

any weight. (TR. 265-66).

In June 2003, the plaintiff told Dr. Johnson that she had general aches and pains but felt well. (TR. 273). The plaintiff reported no fatigue or sleep change and reported that she exercised regularly. (TR. 273). In December 2003, the plaintiff told Dr. Schoen that she had been stable during the summer but had increased right calf pain during the previous two weeks. (TR. 271). The plaintiff also reported that her pain had finally been relieved with Flexeril and she continued to do water exercises and sleep well with medication. *Id*. On physical examination, the plaintiff was generally well and in no acute distress. *Id*. Dr. Schoen reported that the plaintiff had eighteen out of eighteen tender points but negative straight-leg raising, no swelling or effusions, full 5/5 strength, and normal ranges of motion in all joints except for a decrease in internal left hip rotation. *Id*. Dr. Schoen remarked that the plaintiff had experienced a recent flare-up of fibromyalgia, but was back to baseline. *Id*.

The plaintiff stated in her disability application that she belonged to a number of clubs, including a quilting club, although she had several unfinished projects. (TR. 102). The plaintiff's husband noted that the plaintiff had a number of hobbies, including puzzles, water aerobics, ballroom dancing, needlepoint, sewing, and quilting, although she found it difficult to concentrate enough to finish projects. (TR. 114, 116). The plaintiff testified that on a typical day, she gets up at 9:00 a.m., goes to a water aerobics class, then comes back to the house, has lunch, does deadheading in the garden,

and if it's a good day, does some quilting or goes to the community pool for more exercise.  (TR. 338-40).

## V.  Discussion

The plaintiff argues that the ALJ erred in: (1) not discussing the letter from the plaintiff's former supervisor; (2) assigning little weight to Dr. Schoen's RFC assessment; (3) not including in the RFC finding a restriction on attention and concentration ; and (4) finding that the plaintiff's bladder control condition was not a severe impairment.

### A.  Standard of Review.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999).  It is less than a preponderance of the evidence but more than a mere scintilla.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

### B.  Whether the ALJ erred in finding that the plaintiff had the RFC for sedentary work.

The plaintiff argues that the ALJ erred in ignoring a letter, written by her former supervisor, describing how the plaintiff's pain interfered with her work ability. (Doc. No. 11 at 11-13; TR. 269).  Specifically, the plaintiff argues that Dr. Ligler's letter bolstered the plaintiff's credibility and indicated that the plaintiff was not capable of performing her past relevant work.  (Doc. No. 11 at 11-13).

With respect to her credibility argument, the plaintiff relies on *Burnett v. Commissioner,* 220 F.3d 112, 122 (3d. Cir. 2000), which imposes on the ALJ a duty to analyze testimony from lay witnesses which supports a claimant's subjective complaints of pain.  The plaintiff's reference to *Burnett* is misplaced, however, because Dr. Ligler did not testify. (TR. 269).  *See* 220 F.3d at 122 (calling for the ALJ to state some reason for disregarding lay

10

witness "testimony").

While Dr. Ligler's letter may not fall under the rubric of *Burnett*, the Regulations instruct the ALJ to consider statements from "other persons" regarding a claimant's symptoms and how the symptoms affect them. SSR 96-7p. An ALJ must weigh "subjective allegations . . . against objective medical evidence and other relevant information bearing on the issue of credibility." *Adams v. Barnhart,* 2005 WL 1313456, *9 (E.D.P.A. May 31, 2005). Statements such as Dr. Ligler's are such relevant information.

Here, Dr. Ligler described the plaintiff's problems at her former job. (TR. 269). The plaintiff notes that Dr. Ligler's statement is consistent with the plaintiff's allegations, namely, that the plaintiff became unable to handle the stress of her job; that pain in her wrists or hands made it difficult for her to type; and that her data entry and accounting skills diminished. (TR. 269, 345).

As the Commissioner points out, however, the ALJ did not find that the plaintiff should return to that particular job. Instead, the ALJ found that the plaintiff was capable of performing one aspect of her past relevant work, as an accounting clerk. (TR. 22). Indeed, SSR 82-61 states that a claimant is not disabled if he can perform a job as it is usually done in the national economy. SSR 82-61. The plaintiff's inability to return to her past job does not mean that the plaintiff is unable to perform the basic duties of a general accounting clerk. Indeed, the VE testified that the plaintiff's accounting duties from her former job could be isolated from her remaining duties and would be

11

classified as "accounting clerk," a semi-skilled occupation at the lowest end of the skill spectrum.  (TR. 356-57).

Moreover, the ALJ accepted as true the plaintiff's allegations regarding her description of her past work and her difficulty in performing that particular job, the two subjects Dr. Ligler's letter corroborated. (TR. 21-22). *See Burnett* (stating that an ALJ could not ignore lay witness testimony where that testimony could have bolstered the credibility of a claimant the ALJ found not credible).  In fact, although the VE testified that the plaintiff's past relevant work as an administrative assistant, secretary, and accounting clerk was classified by the DOT as sedentary, the ALJ relied on the plaintiff's description of her job to find that the plaintiff's job was light as she performed it.  (TR. 21). The ALJ determined that, "giving some credence to the claimant's complaints of pain," the plaintiff was only capable of performing her past relevant work as an accounting clerk.  (TR. 21-22, 361-62).

### C. Whether the ALJ erred in assigning little weight to Dr. Schoen's RFC assessment.

The plaintiff contends that the ALJ erred in finding that Dr. Schoen's RFC assessment was unsupported by the objective medical record and therefore due little weight.  (TR. 19-20).  A treating physician's opinion is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2).

Moreover, treating source opinions on issues reserved to the Commissioner, such as a claimant's RFC, are not given "any special

12

significance." 20 C.F.R. §§ 404.1527(e)(2), (e)(3). Moreover, "form reports [such as Dr. Schoen's] in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best and when they are not accompanied by thorough written reports, their reliability is suspect." *Claussen v. Chater*, 950 Fed. Supp. 1287, 1291 (D.N.J. 1996) (*citing Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993).

Here, Dr. Schoen opined that the plaintiff was incapable of even low stress jobs; had pain that constantly interfered with her attention and concentration; could sit, stand, or walk only two hours in an eight-hour day; could walk only half a block before experiencing severe pain or needing rest; would need unscheduled breaks; and could never lift or carry any weight. (TR. 265-66).

Dr. Schoen's RFC assessment is not supported by the medical evidence and is inconsistent with the plaintiff's daily activities. Dr. Schoen opined that the plaintiff could walk just half a block before experiencing severe pain. (TR. 265). Yet the plaintiff testified that she walked five times a week for about forty-five minutes to an hour until September 2003, three months after Dr. Schoen stated that walking half a block would cause her severe pain, and sixteen months after her alleged disability onset date. (TR. 266-67, 329-30). Dr. Schoen also identified chronic fatigue as one the plaintiff's symptoms, despite the fact that medical records indicated that the plaintiff was never diagnosed with chronic fatigue syndrome; that after her alleged onset date the plaintiff only occasionally reported trouble sleeping; but more

13

consistently either failed to report fatigue or reported that she had no fatigue. (TR. 17, 183, 187, 271, 273, 278, 280).  Dr. Schoen also opined that the plaintiff was unable to perform any lifting, grasping, reaching, stooping, crouching, or digital manipulation.  (TR. 264-66).  The plaintiff's physical examinations, however, did not reveal that she was in acute distress or had any deficits in strength, range of motion, or the ability to make a fist.  (TR. 183-90, 271-83).

The plaintiff argues that the ALJ's analysis of Dr. Schoen's opinion is inconsistent with the nature of fibromyalgia, which cannot be confirmed by orthopedic and neurologic testing.  (Doc. No. 11 at 15-16).  The ALJ did not, however, reject Dr. Schoen's diagnosis of fibromylagia.  Instead, the ALJ found that the plaintiff had fibromyalgia and that it was a severe impairment. (TR. 20).  What the ALJ rejected was Dr. Schoen's conclusion that the plaintiff's fibromyalgia caused such severe restrictions on her RFC.  (TR. 20, 263-67).  Here, substantial evidence supports the ALJ's conclusion that Dr. Schoen's RFC assessment was not supported by the objective medical record and was inconsistent with the plaintiff's own testimony.  (TR. 22).

D.  Whether the ALJ erred in not including in the RFC finding a restriction on attention and concentration.

The plaintiff next argues that the ALJ erred in not including in the RFC finding a restriction on attention and concentration. (Doc. No. 11 at 17).  The plaintiff contends that her pain and fatigue affect her abilities in those areas. *Id.*

As previously discussed, however, the plaintiff's allegations of fatigue

14

are inconsistent with the medical record. While the plaintiff cites statistics of fatigue in people with fibromyalgia in general, the fact remains that the plaintiff frequently either denied fatigue or failed to report it to her physicians during the period at issue. (Doc. No. 11 at 17; TR. 183, 273, 278). Since her alleged onset date, in fact, the plaintiff alleged sleeplessness only once. (TR. 280). She testified that she sleeps ten hours a night, takes a twenty-minute nap in the afternoon, or a two-hour nap on bad days, and takes an increased dosage of Elavil if she has trouble sleeping. (TR. 336, 350)

The plaintiff testified that her pain interfered with her ability to finish projects, although she also testified she quilted and consistently attended exercise classes. (TR. 338-40, 347, 349). On a typical day, she goes to water aerobics class in the morning and either quilts or goes to the pool in the afternoon. (TR. 338-40, 341-42). On a bad day, the plaintiff cannot help her husband prepare dinner and takes two or three twenty-minute epsom salt baths. (TR. 342-43). Because we think a reasonable mind might accept this level of activity as adequate to support the ALJ's conclusion that no restriction on attention or concentration was warranted, we find that substantial evidence supports the ALJ's decision. *See Hartranft*, 181 F.3d at 360 (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

E.  Whether the ALJ erred in finding that the plaintiff's bladder control problem was not a severe impairment.

Lastly, the ALJ contends that the ALJ erred in not finding that the plaintiff's bladder control condition was severe. An impairment is not severe

15

if it "does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521.  A severe impairment must also meet the duration requirement of a continuous period of at least twelve consecutive months.  20 C.F.R. § 404.1509.  The plaintiff testified that she wears a sanitary pad, goes to the bathroom about twelve times a day, and that she always needs something to drink due to dry mouth.  (TR. 346-47).

Notably, the most frequent notations to urinary incontinence, four in total, appear in the part of the medical record that pre-dates the plaintiff's alleged disability onset date.  (TR. 202, 227, 229, 246).  According to the medical record, the plaintiff first complained of urinary incontinence in April 1999. (TR. 246). Although the plaintiff reported the need to void every fifteen minutes in August 2000, by September 2000 she reported good results with her medication. (TR. 227, 229). The plaintiff's urinary frequency appears in the medical record only one time since her alleged disability onset date, in February 2003. (TR. 183). Dr. Johnson noted that the plaintiff's urology work-up was negative and told the plaintiff to double her dosage of a medication she took for the problem. *Id*. The plaintiff sought no further treatment for the problem. (TR. 186-90, 271-83).

While the plaintiff alleges that her condition has worsened since September 2003, the medical record indicates no relevant complaints after February 2003.  (TR. 182-84).  This lack of complaints about urinary incontinence or frequency after the plaintiff's alleged onset date is substantial evidence supporting the ALJ's determination that the plaintiff's urinary

16

incontinence was not a severe impairment.  (TR. 17).

## VI. RECOMMENDATION

Based on the foregoing, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security be **DENIED**.

                                  S/ Malachy E. Mannion
                                  **MALACHY E. MANNION**
                                  **United States Magistrate Judge**

**Dated: October 12, 2006**
O:\shared\REPORTS\2005 Reports\05-2491.01.wpd